

Joshua Cobin
1892 N Hamilton Pl.
Chandler, AZ 85225
Telephone: (602) 390-9130
joshua@cobin.me
Plaintiff, in Proper Person

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JOSHUA COBIN,<br><br>           Plaintiff,<br><br>v.<br><br>CITY OF PHOENIX, A MUNICIPAL CORPORATION; JERI L. WILLIAMS; BENJAMIN MOORE; ROBERT SCOTT, DOUGLAS MCBRIDE; CHRISTOPHER TURIANO, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES.<br><br>           Defendants | Case No.:<br><br>**CV-19-04392-PHX-SPL**<br><br>**ACTIONS FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF; DEMAND FOR JURY**<br><br>**1. EXCESSIVE FORCE (42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENTS)**<br>**2. FREEDOM OF SPEECH AND ASSOCIATION (42 U.S.C. § 1983 FIRST AND FOURTEENTH AMEDMENTS)**<br>**3. DUE PROCESS (42 U.S.C. § 1983 FOURTEENTH AMENDMENT)**<br>**4. EQUAL PROTECTION (42 U.S.C. § 1983 FIRST AND FOURTEENTH AMENDMENTS)** |

### INTRODUCTION

1. This is an action to enforce Plaintiff's fundamental constitutional rights of speech and association, and to be free from excessive police force and from discrimination and harm by law enforcement based on the content of their speech. On the night of August 22, 2017, a force of close to 900 officers of the Phoenix Police Department (hereinafter referred to as "PPD") conducted an unannounced attack on Plaintiff and hundreds of others who had gathered outside the Phoenix Convention Center to protest in connection with a speech by President Trump; the goal of this assembly was to demonstrate strong disagreement with President Trump's and his supporters' racist and anti-immigrant policies and views. Defendant knew that most, if not all, of those that the police attacked were acting in a peaceable manner, but disregarded the well-being of these anti-Trump protestors (including Plaintiff) as well as well-established constitutional mandates and police policies. PPD personnel indiscriminately fired harmful pepper spray, gas, pepper bullets, and flash-bang canisters into the assembled crowd, which

1

included children, elderly people, disabled people, and pregnant women. The failure of the Phoenix Police to warn the peaceably assembled crowd (which included Plaintiff) of the coming attack, as is required by the Constitution, and to provide for a safe dispersal route for the protesters to avoid the police onslaught, guaranteed the ensuing widespread panic and fear amongst those assembled and resulted in physical and emotional injuries, as well as constitutional violations.

2.  Defendant Chief of Phoenix Police Jeri L. Williams predictably had fulsome praise for the Phoenix Police personnel at the scene of the attack on the assembled crowd; as then-Mayor Greg Stanton stood by, she wholeheartedly endorsed and ratified the actions taken by Phoenix Police officers. City Manager Ed Zuercher also praised the police for their conduct at the gathering. Despite a significant increase in the Phoenix Police Department's use-of-force incidents against civilians, including the events of August 22, 2017, and many other police-on-civilian shootings, City officials, including the Police Chief, the Mayor, the City Manager, and the City Council members have failed to condemn this police violence and to take any meaningful steps to stop it, reduce it, or address the trauma that police violence causes to individuals, families, and communities in the City of Phoenix. In 2018 alone, there were forty-four (44) officer-involved shootings by the Phoenix Police resulting in twenty-two (22) deaths (plus another death by taser), more than double the amount that occurred in 2017. In 2018, there were more shootings in Phoenix than in any of the country's 4 largest cities.

3.  This action seeks injunctive relief to restrain the Phoenix Police Department's use of excessive force against civilians and to prohibit future disruptions of the peaceable exercise of First Amendment rights. Absent the Court's intervention, those who wish to gather and speak will continue to experience understandable fear of police retaliation when participating in protests, demonstrations, and marches, particularly when expressing anti-Trump views. This action also seeks damages to compensate Plaintiff for the denial of their First, Fourth, and Fourteenth Amendment rights on August 22, 2017, and for the physical injuries and emotional harms resulting from the Phoenix Police Department's excessive use of force.

**JURISDICTION AND VENUE**

4. This action arises under 42 U.S.C. § 1983 and the laws and Constitution of the United States. Jurisdiction lies under 28 U.S.C. §§ 1331, 1343, and 1367. The Court has jurisdiction to issue declaratory and/or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57. The Court has authority to award attorneys' fees under 42 U.S.C. § 1988(b).

5. Venue properly lies within this District under 28 U.S.C. § 1391(b). The Defendants are all public officials or other employees or agents of the City of Phoenix, as well as the City itself. Each of the Defendants resides within this District and/or performs official duties within the State of Arizona. This Court, accordingly, has personal jurisdiction over each of the Defendants.

6. The named Defendants perform their official duties in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims have occurred or will occur in this District.

### PARTIES
#### *Plaintiff*

7. Plaintiff Joshua Cobin was a resident of Scottsdale, Arizona at the time of the protest. Mr. Cobin is now a resident of Chandler, Arizona and works for a Google contractor in Tempe, Arizona. Mr. Cobin attended the protest to witness first-hand and join the opposition to Trump, to document the protest, to assist other protesters in case of violence, and to express his own views critical of Trump's policies to Trump supporters (See attached Exhibit 1). After PPD began to illegally disperse the lawful assembly where Mr. Cobin was standing, PPD shoved Mr. Cobin with riot shields to force him to move from a location where he had a constitutional right to be assembled (See attached Exhibits 9, 10, 11, 12, 13, and` 14). Later that evening, Officer Christopher Turiano used excessive force in subduing Mr. Cobin by deliberately shooting him in the groin with an OC 40mm foam "pepper ball" round (traveling upwards of 200 mph) from a distance of approximately 20 yards away, in violation of PPD's own policies, and with malicious intent to humiliate Mr. Cobin (See attached Exhibit 4). Mr. Cobin suffered injuries and emotional trauma so severe he could not continue his expressive activities and had to seek medical attention. In the days following the protest, PPD labeled Mr. Cobin as (and continues to label him as) a member of a group named "Antifa" during press releases, press conferences, and evidentiary photos (See attached Exhibit 19). This group has been identified by the FBI as a terrorist organization. Mr. Cobin vehemently denies any association with such a group and to date PPD has not produced a

3

single shred of evidence to support this claim, despite searching Mr. Cobin's residence, vehicle, and mobile device. Prior to this incident, Mr. Cobin had peacefully attended many political protests and rallies without incident. As a result of the intentional humiliation inflicted by Officer Turiano, the video of which became a national news story seen by millions of people worldwide, and the PPD labeling him a member of a terrorist organization, Mr. Cobin's reputation has been irreparably harmed. Plaintiff was also the target of mockery on social media by active Phoenix PD officers after the event (See attached Exhibits 20-26). Mr. Cobin wants to continue to be active in political rallies and protests in his community, but is concerned that the PPD will continue to target peaceful protesters and himself. Mr. Cobin is chilled from participating in future protests and politically expressive activities in Phoenix without significant reform to the Phoenix Police Department's policies, practices, and procedures concerning the use of force against peaceful protesters and protecting speech and associational rights.

***Defendants***

8.  Defendant City of Phoenix is a municipal corporation, organized and existing under the laws of the State of Arizona. The Phoenix Police Department is an agency of the City of Phoenix, and all actions of the PPD are the legal responsibility of the City.

9.  Defendant Jeri L. Williams is, and was at all relevant times, the Chief of Police for the City of Phoenix. As such, Chief Williams is the final policy maker for the City of Phoenix in the area of law enforcement and in setting and implementing the policies and practices of the PPD including but not limited to the development, implementation, and the training of PPD personnel in these and all PPD areas, including the procedures, policies, regulations, and practices related to the proper use of force and the need for prior warnings, in response to political protests, and public demonstrations, and marches. At all relevant times, Chief Williams was responsible for the development of policies concerning protests and the protection of participants' basic rights of speech and association, for making these policies known to all PPD personnel, and for ensuring that all members of the PPD were adequately and consistently trained in their meaning and implementation, as well as in all relevant constitutional requirements and police best practices. Chief Williams was responsible for the training

4

and preparation of PPD personnel with respect to the events of August 22, 2017, and she approved and/or ratified the PPD's plans for that event including the unconstitutional acts complained of herein. As set out below, Chief Williams failed to establish sufficient guidelines and regulations governing the PPD in the situation presented on August 22, 2017, and did not ensure adequate training before the event, or properly supervise and monitor the actions of PPD personnel during the protest. As set out below, after becoming aware of the events and the actions of PPD on the scene, Chief Williams praised the members of the PPD with then-Mayor Stanton by her side, and fully ratified the actions of PPD personnel. City Manager Ed Zuercher also praised and ratified the PPD's decisions and actions complained of herein. Chief Williams is sued in her official and individual capacity.

10. Defendant Benjamin Moore is a Lieutenant with the PPD. On August 22, 2017, he was designated as the "Alpha Leader" and "Field Force Commander" in charge of all PPD units working the night of the Trump rally and protest. Lt. Moore gave the initial improper orders for PPD officers to use force against anti-Trump protestors, including Plaintiff, that resulted in indiscriminate attacks against hundreds of peaceable protesters without warnings and before any unlawful assembly had been declared. Plaintiff sues Lt. Moore in his official and individual capacity.

11. Defendant Robert Scott is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers". As set forth herein, Officer Scott indiscriminately fired non-lethal chemicals weapons into the crowd of anti-Trump protesters to force Plaintiff and others to move from an area where they were lawfully assembled. Plaintiff sues Officer Scott in his official and individual capacity

12. Defendant Douglas McBride is a Sergeant with the PPD. On August 22, 2017, he was assigned as the "Grenadier Team Leader" for the Trump rally and protest. According to PPD, grenadiers are "specialty trained officers on deployment of chemical munitions". Plaintiff sues Sgt. McBride in his official and individual capacity.

13. Defendant Christopher Turiano is an officer with the PPD who was assigned to the PPD's Tactical Response Unit as one of the "Grenadiers." As set forth herein, Officer Turiano maliciously and

intentionally aimed at and shot Plaintiff in the groin/genital area with a high velocity OC 40mm "pepper ball" round. Plaintiff sues Officer Turiano in his official and individual capacity.

14. Each of the above individual Defendants participated in and has responsibility for the unlawful conduct and resulting injuries to Plaintiff, by, among other things, personally participating in the unlawful conduct, or acting jointly or conspiring with others who did so; authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing and refusing, with deliberate indifference to Plaintiff's rights, to initiate and maintain adequate training and supervision; and ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

15. In doing the acts alleged herein, Defendants, and each of them, acted within the course and scope of their employment for the City of Phoenix.

16. In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law. In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, employee, and/or in concert with each of said other Defendants herein.

## STATEMENT OF FACTS

17. The election of Donald J. Trump in November 2016, and his harmful policies and attitudes related to migrants, police misconduct, discrimination, women, education, health care, foreign affairs, and gun control, to name a few, have invigorated millions of Americans to join anti-Trump protests and demonstrations in record numbers across the nation. Overwhelming numbers of protestors, many newly motivated by the cruel and unjustified policies of the present administration, are participating in demonstrations for the first time to express their criticism. Arizonans found themselves the target of Trump's racist and anti-immigrant politics when, in the summer of 2017, he publicized his intent to pardon former Sheriff Joe Arpaio, who had been convicted of criminal contempt of court after disobeying a federal judge's order to end the practice of racial profiling and detaining persons suspected of being in the United States unlawfully solely based on their perceived Latino race. When

6

Trump announced plans to speak in Phoenix just before his anticipated pardon of Arpaio (who is widely known for visiting indignities on prisoners and terrorizing immigrant communities in Maricopa County), Arizonans (including Plaintiff) planned to take to the streets.

### *Plans to Demonstrate in Quintessential Public Fora*

18. On August 16, 2017, Trump's campaign announced that he would deliver a speech at a campaign-style rally at the Phoenix Convention Center less than a week later. This announcement came on the heels of a violent clash between two groups of demonstrators in Charlottesville, Virginia, one group consisting of white supremacists and one group consisting of pro-social-justice advocates. One woman was killed by the intentional act of a white supremacist, and several were injured in the clashes in Charlottesville. Trump reacted to the events in Charlottesville by proclaiming that there were "good people" on both sides.

19. In light of those events, Mr. Cobin felt compelled to attend and protest at President Trump's visit to Phoenix the following week. Mr. Cobin wanted to exercise his constitutional right of assembly and right to freedom of speech in order to ask the President (and his supporters) to not pardon former Maricopa Sheriff Joe Arpaio and express dismay over the statements the President had made the week before.

### *PPD Used Excessive Force to Unlawfully Disperse Anti-Trump Protestors in Violation of the Fourth Amendment*

20. PPD officers were present from the beginning of the demonstration. As early as 2:30 P.M., despite the absence of any indication of violence, PPD officers obscured their identities by face shields and vests and other equipment covering their badges. Many officers had weapons drawn despite the peaceful and lawful assembly as anti-Trump protesters convened throughout the afternoon, and later waited for the speech to end and the many Trump supporters to leave the Convention Center and travel close enough to hear the protesters' chants and see their many anti-Trump signs.

21. PPD officers, including "grenadiers," were equipped with several types of chemical and projectile weapons including:

    a.  Pepper bullets;

b.  40 mm foam impact rounds, which travel at speeds of 89 miles per hour and contained "CS" (irritant) powder and cayenne pepper to deliver both blunt trauma and the effects of an irritant powder;

c.  Flash-bang grenades, which are devices that produce loud explosive noises and bright flashes of light;

d.  Smoke grenades, which are explosive devices that release smoke;

e.  "Stingers," which are explosive devices that release smoke, rubber, pellets, and a chemical irritant within a radius of approximately 50 feet; and

f.  Canisters containing "CS," or tear gas.

The manufacturers' specifications describe these munitions as designed to incapacitate subjects, and to inflict pain to compel compliance. Despite PPD's presence, including many officers in riot gear with weapons powerful enough to incapacitate and cause serious and lethal injuries, anti-Trump protestors (including Plaintiff) remained peaceful throughout the day.

22. Upon information and belief, Trump's presence meant that PPD coordinated regarding plans for crowd control with officers from the Secret Service and other federal agencies.

23. Officers from many other law enforcement agencies in Arizona were also present to provide support and assistance during the demonstrations. Among those forces present were representatives of Federal agencies and mounted police from the Tempe and Scottsdale police departments, with experience and expertise in dispersing large crowds. The PPD had the primary crowd-control role throughout the demonstration, and made the decision to use the incapacitating weaponry indiscriminately against hundreds of peaceably assembled anti-Trump protestors without warning.

24. Plaintiff arrived downtown to the demonstration at approximately 4:45 P.M. Plaintiff parked near the Convention Center and walked to where the crowd of anti-Trump protestors had gathered, near 2nd Street and Monroe. Plaintiff carried a sign while peacefully and lawfully exercising his rights to free speech and assembly (See attached Exhibit 1).

25. President Trump arrived at the Convention Center at approximately 6:32 P.M.

26. Without provocation, at approximately 7:00 P.M., PPD officers in riot gear formed a line ("Police Line") on Monroe Street in the "safety zone" in front of anti-Trump protestors who assembled during the afternoon directly across from the north entrance of the Convention Center. Anti-Trump protestors were awaiting the end of Trump's rally inside the Convention Center, and his and his supporters' exit from the building.

27. Despite there being no provocation or dangerous acts by anti-Trump protestors, at approximately 7:03 P.M. and 7:13 P.M., the PPD increased its already forceful presence in that area as several additional police units arrived to join the growing Police Line on Monroe Street.

28. Without any precipitating conduct by the anti-Trump protestors, at 7:19 P.M., the Police Line of officers (all wearing helmets and masks obscuring their faces and badges), took several steps forward in a northern direction, in unison, towards the anti-Trump protestors (See attached Exhibits 5, 6, 7, and 8).

29. On information and belief, PPD removed its officers stationed in the designated "free-speech zone" nearby the anti-Trump protestors at approximately 8:20 P.M., without explanation or notice to protest organizers, including Plaintiff.

30. As the Trump rally inside the Convention Center was ending, several dozens of officers filed out of the Convention Center in riot gear heading west towards Second Street to join the Police Line. By 8:29 P.M., the number of PPD officers in the Police Line forcefully confronting anti-Trump protestors had grown significantly. The only attempted excuse for this increased show of force was that a few individuals had thrown plastic water bottles; none of the officers were injured.

31. PPD did not attempt to identify or separate from the gatherings of anti-Trump protesters any individuals they considered to be problematic or possibly engaged in improper conduct. As later events revealed, PPD instead opted for a "let's fire on all" tactic that endangered the rights and well-being of hundreds of peaceable persons, including children and the elderly; PPD personnel were apparently trained in the tactic of firing on all in a crowd as the best method for shaking out one or two persons of concern, if even present at all.

32. At approximately 8:30 P.M., Trump and other federal officials began exiting the Convention Center. After hours of assembling and gathering in Phoenix's sweltering heat all day, anti-Trump protesters were about to have their opportunity to chant and display their signs to express their views to Trump and his supporters as they exited the Convention Center.

33. At 8:32 P.M. hundreds of anti-Trump protesters were assembled behind the pedestrian fencing along Monroe Street. As a result, a twenty-foot portion of the fence was shaken. PPD gave no warnings that either force would be used, or that the crowd would be dispersed if the fence continued to shake.

34. At this time, Plaintiff was located to the west of the where the pedestrian fence was being shaken and unaware of the fact that this was taking place. *De facto* protest organizers had told the crowd via megaphones that the crowd should head west towards the city capitol to protest in front of a Confederate monument. Plaintiff was tired from a long day of work and being in the heat so he followed the crowd as they slowly moved in that direction.

35. Without first ordering officers to warn protestors about touching the fence, and with no warning or clear instruction about how to avoid the attack and where to disperse, Defendant Lieutenant Benjamin Moore and Defendant Sergeant Douglas McBride ordered officers to fire pepper balls into the assembled crowd.

36. At no time between 2:00 P.M. to 8:32 P.M. did PPD announce to the assembled protesters that any force would be used against them or that an attack by PPD personnel was imminent. Nonetheless, Lt. Moore ordered officers to shoot gas, projectiles, and munitions, but never ordered them to warn protestors prior to opening fire. As later acknowledged, PPD had insufficient megaphones, sound magnifying devices, or plans to effectively communicate to a large crowd. No declaration of an unlawful assembly or order to disperse was made between 2:00 P.M. and 8:32 P.M. when Defendants Lt. Moore and Sgt. McBride gave the order to use force.

37. Defendant Officer Robert Scott was the first to deploy pepper bullets. Scott shot the first pepper bullets, impacting the ground in front of the anti-Trump protesters closest to the fence. Other PPD officers immediately joined him, and together officers shot at least another ten pepper bullets in rapid succession towards anti-Trump protesters in the same general area. (See attached Exhibit 5, a screen

shot of first pepper bullet rounds). The crowd in the immediate vicinity dispersed (See attached Exhibit 7, a, screen shot of "free-speech zone" nearly clear of anti-Trump protestors). Despite this, Officer Scott continued to fire pepper bullets at protestors who were dispersing (including Plaintiff, see attached Exhibits 9 and 10). Scott was apparently trained that he could ignore the PPD policy prohibiting firing pepper bullets above a person's waist when he reported that he "deployed multiple rounds of pepper ball," while "aiming at the torso of the subject."

38. At 8:33 P.M., one minute after officers fired the initial rounds of pepper bullets at protestors, two plastic water bottles were thrown from the crowd. One landed several feet in front of the Police Line, and another landed over their heads. No PPD officers were injured by the plastic bottles. No protestor was engaged in any violent or threatening conduct, including Plaintiff. At this time, anti-Trump protesters were chanting, "Hands up! Don't shoot!" and other anti-Trump and social justice messages.

39. At 8:35 P.M., without any provocation, warning, or declaration of an unlawful assembly, an officer along Monroe Street threw the first visible tear gas canister towards the anti-Trump protesters standing along the pedestrian fencing (See attached Exhibit 6). That canister erupted in yellow smoke, harming protesters who had been peacefully assembled. Again without warning, a second officer threw another gas canister toward protestors. (See attached Exhibit 6). Utter chaos ensued. Protestors, including children and elderly people, ran from the gas, screaming, coughing, and crying. The gas and fumes were unexpected and persons with mobility issues required assistance to retreat and get to safety. Anti-Trump protesters who remained in the area, including Plaintiff, acted to kick and clear the gas canisters away from the protestors to protect them from the chemicals. Plaintiff assisted many people affected by the chemical gas to find a safe exit and poured water on fellow citizens' eyes to ease their pain caused by the irritants in the gas. PPD fired three more gas canisters, two of which were kicked or thrown in directions away from the anti-Trump protesters. PPD officers launched three more gas canisters toward the anti-Trump protesters and violently attacked them with other chemical weapons and projectiles. Protesters continued running away, screaming, confused, terrified, dodging rubber bullets, gas canisters, and unidentifiable projectiles launched at their torsos and heads in violation of PPD policy. Anti-Trump protesters fled while holding their shirts or cloths over their noses and mouths

11

to block the gas and pepper spray that burned their eyes, throats, and lungs. Plaintiff continued to assist several victims of this violence by pouring water on their face or helping them get off the ground and run away. Still at this point in time, the PPD had not declared an unlawful assembly and had given no dispersal order.

40. PPD then escalated its use of force on protesters by deploying flashbang grenades on the ground and in the air, which emitted loud booms and clouds of green and grey gas. PPD had not yet declared an unlawful assembly, given any dispersal instructions to protesters, or directed protesters to an area where they could continue their peaceful assembly. At no point before 8:32 P.M., when force was first used, did any person from PPD give Plaintiff or any anti-Trump protesters warning that force would be used, or information about where to go for safety or to continue their assembly.

41. At 8:44 P.M., PPD still had not declared an unlawful assembly, or issued an order to disperse or warnings that officers would continue to use violent force. Yet, Lt. Moore next ordered PPD officers to use force against anti-Trump protesters by "mov[ing] into the crowd and clear[ing] the area all the way to Van Buren," without warning or direction to anti-Trump protesters that the area should be cleared before force was used. As ordered, PPD officers with riot helmets on, shields drawn, and rifles aimed to shoot chemical munitions and projectiles advanced on the anti-Trump protesters and breached the pedestrian gate on Monroe Street. Officers in the Police Line continued to fire tear gas and pepper balls into the crowd as they marched in unison towards Plaintiff and other peaceably gathered protesters, effectively corralling them away from the designated demonstration area and water station by using riot shields to forcefully shove Plaintiff and other protesters aside. (See attached Exhibits 9, 10, 11, 12, 13, and 14).

42. The riot-gear-clad officers moved into the areas of assembly designated for anti-Trump protesters while firing projectiles indiscriminately and without prior, or even simultaneous, warnings. Anti-Trump protesters had no opportunity to collect their personal property and signs containing their political messages. PPD also shoved the anti-Trump protesters with their shields even as the protesters were moving out of the area. (See attached Exhibit 11). As PPD advanced north, PPD trapped Plaintiff and other protesters within the barricades of the zone, forcing them to climb, jump, or otherwise find a

way over the barricades to escape PPD's attack. PPD's actions took no considerations for the elderly or persons with limited mobility, some of whom were in wheelchairs and had to unexpectedly, and without warnings, flee PPD's advancing violence.

43. Through all of this, PPD gave no instructions to protestors about where to disperse, nor did PPD give any instructions to disperse in the minutes before the first projectiles were shot by police at 8:32 P.M., through the next 30 minutes. As of 9:00 P.M., no unlawful assembly had been declared and no dispersal orders had been given despite the violent actions of PPD officers using their weapons to disperse the anti-Trump protesters.

44. Between 8:32 and 9:00 P.M., the Police Line continued to move north on both Second and Third Streets, forcefully driving anti-Trump protesters out from the area by indiscriminately shooting them with gas canisters and pepper bullets at close range in the head, face, upper back, stomach, and groin areas. PPD officers shot anti-Trump protesters who were taking photos or video. Ignoring department policy, as they advanced, PPD sprayed Plaintiff and other protesters in the face with pepper spray from just inches away even as they were following orders and retreating (See attached Exhibits 12, 13, and 14). PPD never warned these protestors that force would be used based on any conduct they were engaging in. PPD sprayed at least one member of the media who was documenting her retreat from the violence on video, in the face and camera lens – even as she was moving away from the Police Line (See attached Exhibit 11). PPD never warned her that an officer would directly spray her face if she kept recording.

45. The first instructions to disperse were finally heard from a helicopter at approximately 9:00 P.M. PPD's own "After-Action Report" confirms that it was not until around 9:00 P.M. that an air unit was used "to make announcement to disperse." The dispersal orders from the helicopter were in English only, ignoring that some of the participants may not have understood English. For nearly 30 minutes prior, PPD had rained pepper bullets, gas canisters, and pepper spray without warnings on anti-Trump protesters, including Plaintiff. These after-the-fact helicopter announcements never warned anti-Trump protesters that they would be shot with projectiles, gas, or other munitions.

13

46. After the dispersal order was given from the helicopter, PPD continued indiscriminately using chemical and impact munitions, pepper spray, and their shields as weapons against anti-Trump protesters in the assembly, including children, persons with disabilities and mobility issues, and the media. Dozens of individuals were shot at close range as officers unloaded their weapons at anti-Trump protesters. Fleeing protesters were trapped with PPD advancing violently from the south and barricades erected by PPD blocking their escape to the north. Individuals were forced to climb or jump over the barricades, with some people falling over them in flight and some with mobility issues requiring assistance from others to breach the barricades. While breaking up the lawful demonstration, PPD officers shouted obscenities at the peaceful protesters. Contemporaneous with firing chemical and impact munitions at anti-Trump protesters, PPD officers yelled: "stun bag that guy, oh yeah, yep that'll teach him," and "that's right motherfuckers, you just smoked yourself, dumbasses."

47. At 9:14 P.M., several "grenadiers" continued to "target anyone who aggressively approaches the police line with pepper balls." As the officers moved north, they targeted anti-Trump protesters in their path with projectiles and other force as the officers continued to fire chemical and impact munitions, gas, and pepper spray at persons with no evidence that any of the persons who were shot had engaged in any improper conduct.

48. Defendant officers were aware that they were targeting protestors despite their peaceful status. PPD acknowledged in an after-action report dated August 28, 2017, **"It is important to note that the vast majority of participants on August 22 in both the campaign rally and the protests outside were peaceful, prepared and civil."** (Emphasis added).

49. Despite knowing that anti-Trump protesters were "peaceful, prepared and civil," PPD officers indiscriminately used unlawful and excessive force as follows:

    a. ***Defendant Officer Scott*** was a grenadier and the first to fire chemical weapons at the anti-Trump protesters. According to Scott, he shot at anti-Trump protesters, including Plaintiff, to "make the immediate area unpleasant to be in because of irritant in the pepper balls." Without warning, Scott "began attempting to directly impact[] the legs of the subjects that remained" in the area. Still giving no warning, Scott also shot the torso of an "older male" who was

touching the pedestrian fence with "direct impact" weapons. With no unlawful assembly declared, Scott "deploy[ed] pepper ball to clear out the remaining people at the pedestrian fence." On orders from Moore and without any warnings, Scott erratically fired "multiple rounds of pepper ball using the area saturation method." Officer Scott continued to fire projectiles and chemical weapons indiscriminately at anti-Trump protesters, including Plaintiff, without warning throughout the night. Officer Scott infringed on Plaintiff's constitutional free speech and assembly rights by carrying out these actions.

   b.   ***Defendant Officer Turiano*** was among the grenadiers working at the Trump rally and protest. After the Police Line was assembled on Monroe and N. 1st St., Officer Turiano, without warning or reason given, fired a tear gas canister at close range, hitting a woman in the back. The woman, later identified as Janet Travis, was merely taking pictures and observing the protest. Plaintiff had never met Janet Travis prior to the protest and was merely concerned for her well-being. When the woman fell down, Plaintiff and another unknown female ran towards the woman to provide assistance and help her escape from the advancing Police Line. After Plaintiff and the other individual had picked up the woman on the ground, they started running away from the quickly advancing police line. Officer Turiano then fired another tear gas canister at the three retreating individuals, striking the woman in the lower back / upper glute and bouncing off of Plaintiff's back, causing great pain and emotional distress to both parties (See attached Exhibits 14, 15, 16, 17, and 18). Approximately 30 seconds later, Plaintiff kicked a smoking tear gas canister on the ground back towards the Police Line and quickly retreated. Per his own After Action Report, Officer Turiano then switched munitions from OC tear gas to a high velocity "foam impact round". Despite his knowledge that a fired "impact round" can exceed speeds of 220mph, he maliciously and intentionally aimed at and fired an impact round at Plaintiff's groin and genital area, hitting his groin from about 20 yards away. Plaintiff collapsed from the impact and was dragged off for medical assistance. Officer Turiano alone fired at least 40 rounds of impact weapons, tear

gas, and smoke bombs that evening. The Phoenix New Times estimates he alone fired over half of the non-lethal munitions used that evening by the nearly 900 officers present.

   c.   **_Defendant Sgt. McBride_** was in charge of the actions of all of these officers. Sergeant McBride was on Monroe Street with his team of grenadiers when Lt. Moore ordered PPD officers to use "smoke and gas grenades" on anti-Trump protesters without warning, and took no action to stop this conduct. After Lt. Moore improperly ordered the lawful assembly to be cleared, Sgt. McBride ordered the team of grenadiers to "support the skirmish line," move into the crowd, and on his orders grenadiers fired chemical and other projectiles indiscriminately without warning to "clear[] the area all the way to Van Buren." Sgt. McBride did nothing to intervene in the use of excessive force and violations of PPD policy.

50.  The Phoenix Police Department had approximately 882 police officers on hand at the Trump rally and protest, yet made no attempt to isolate any individuals or groups that may have been engaging in improper or unlawful conduct. Instead, PPD used unwarranted and unlawful indiscriminate force against all anti-Trump protesters. PPD made no attempt to arrest Plaintiff, instead choosing to use a projectile launcher to punish and humiliate a perceived threat.

51.  PPD officers advanced towards hundreds of anti-Trump protesters assembled north of the Convention Center, regardless of whether they had engaged in any unlawful activity – shooting them with so-called "less lethal" munitions designed to incapacitate, and which did knock many protesters to the ground. PPD officers did not use such force to effectuate arrest, overcome resistance to arrest, or in self-defense. The anti-Trump protesters did not resist arrest, attempt to escape arrest, use force upon any person, or threaten to use force upon any person. Yet, without regard to whether anti-Trump protesters were engaged in unlawful activity, PPD officers fired their dangerous weapons indiscriminately, aiming at and striking the upper torsos and heads of protesters—in violation of manufacturer's warnings and PPD policy.

52.  As a result, Plaintiff is understandably hesitant to engage in further speech, assembly, demonstrations, and gatherings in Phoenix, particularly when expressing criticism of Trump and his supporters. As it

was on August 22, 2017, the PPD will be the primary law enforcement agency at future demonstrations in Phoenix.

53. PPD injured Plaintiff by this violence as follows:

    a.    ***Plaintiff Joshua Cobin*** was indiscriminately sprayed with tear gas, pepper spray and hit by projectiles during the initial unannounced attack on protesters by PPD at approximately 8:32pm that evening, violating his First, Fourth, and Fourteenth Amendment rights. Mr. Cobin is allergic to the primary chemical component in these crowd control munitions (cayenne pepper / capsaicin). As Mr. Cobin was dressed for the 100-degree-plus fall weather in Phoenix, he was wearing shorts and a short sleeved shirt. Mr. Cobin was aware that other police departments had used chemical weapons to disrupt lawful protests nationwide and was fearful of the allergic reaction that would be triggered by inhaling gas containing cayenne pepper or capsaicin. Mr. Cobin brought a gas mask in case he needed to protect himself from the effects of the chemical gas. Even so, during the initial use of chemical weapons to illegally disperse the crowd in front of the convention center, any of Mr. Cobin's exposed skin immediately began to burn from an allergic reaction to the chemicals used in the crowd control weapons deployed by PPD. The Police Line advanced and forcibly corralled peaceably assembled protesters (including Plaintiff) away from the Phoenix Convention Center by shoving them with riot shields and deploying more tear gas. Later that evening, after helping a fallen woman shot in the back/shoulder with a tear gas canister by Officer Christopher Turiano, Officer Turiano shot both of them in the back with a tear gas canister at close range while they were retreating, inflicting great pain and emotional distress for both parties. Moments later, the same Officer Turiano deliberately and maliciously fired an "impact round" at Mr. Cobin's groin with intent to humiliate and injure him. Despite his knowledge that a fired "impact round" can exceed speeds of 220mph, he maliciously and intentionally aimed at and fired an impact round at Plaintiff's groin and genital area, hitting his groin from about 20 yards away. Mr. Cobin suffered extreme pain and humiliation as a result of a high velocity projectile hitting him in such a sensitive area. To put this in

perspective; in professional baseball, the pitcher's mound is located 60.6 feet (20 yards) from the batter's box. However, baseball pitches rarely exceed speeds of 100mph, nearly half the speed of the impact round fired by Officer Turiano. Also, in baseball, players are wearing protective equipment to protect sensitive areas of their body from stray pitches. Mr. Cobin had no such luxury. After being helped off of the street, Mr. Cobin drove himself to the emergency room where he was treated for exposure to chemical agents. Due to Mr. Cobin's allergy to cayenne pepper / capsaicin, he suffered extreme pain on any exposed skin for several hours that evening. Medical staff at the emergency room directed him to take a detox shower nude in front of 3-4 staff members, further adding to his humiliation. Mr. Cobin suffered severe pain and bruising in the area an inch above his genitals. Before opening fire on Plaintiff and other anti-Trump protesters, PPD gave no warnings that officers were planning to use force. Since being shot, Mr. Cobin is fearful and distrusting of the PPD. After the event, Officer's Turiano's actions became nationwide news. Millions of people watched videos of Mr. Cobin being shot in the groin on the internet and national TV stations. Mr. Cobin received many threatening and mocking messages on his social media accounts in the following weeks. At least 3 active Phoenix Police officers posted mocking and hateful messages on their personal social media accounts immediately following the incident (See attached Exhibits 20-26). Mr. Cobin was also labeled by PPD (without proof) as a member of "Antifa", a group labelled by the FBI as a terrorist organization. This has irreparably harmed Plaintiff's reputation and future employment potential. For Mr. Cobin, it has been a source of angst to see on the internet, in newspapers, and on television reports across the world photos and videos of him being shot in such a humiliating fashion because it feels like an extreme invasion of privacy.

54. PPD officers deliberately fired at Plaintiff and at the upper torsos of anti-Trump protesters, based on their training and with the approval of PPD command staff. But even if the officers had done nothing more than shoot indiscriminately at the lower torso area of the adults, that put them in direct range of the upper torsos and heads of children and persons in wheelchairs who were participating. It was sheer

luck that (to Plaintiff's knowledge) no child was struck in the head with a projectile given the indiscriminate deployment of over 590 munitions at the peaceful, fleeing assembly, especially with the use of weapons intended to incapacitate and having the potential to cause death or great bodily injury when used as the PPD did on this occasion—at close range and to the upper torso, head, and face areas of protestors.

55. There was no probable cause or reasonable suspicion to believe that anti-Trump protesters or Plaintiff posed an immediate or credible threat of injury to police or any other person.

56. The PPD never attempted to disperse the demonstrators with less violent measures, including making announcements directing the crowd to disperse, or calling in the mounted police forces from the Tempe and Scottsdale police departments who were trained in crowd control measures and deployed to the demonstration for the purpose of assisting the PPD in this very task. Nor did PPD attempt to insulate the overwhelming majority of the protestors, who they knew had been peaceable throughout the demonstration, from unnecessary attack, injuries, and loss of basic rights, by separating from the crowd the handful of persons PPD claims had acted wrongly.

57. Many hundreds (and perhaps thousands) of peaceful protestors including men, women, and children who had been engaged in no criminal activity— and who were attempting to disperse after PPD's attack began—were physically injured as they were shot with munitions, gas, pepper spray, and/or assaulted by the advancing Police Line.

***Using Violence, PPD Violated the First Amendment Rights of Anti-Trump Protesters to Assemble and Speak Their Views Critical of Trump***

58. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

59. Trump's visit received significant publicity because he had announced that he would deliver remarks that might include the pardon of former Sheriff Arpaio. On August 22, 2017, when temperatures hit 108 degrees, record numbers of anti-Trump protesters began arriving in downtown Phoenix. Some gathered downtown, while others participated in marches and demonstrations nearby in advance of the main demonstration near the Convention Center set to begin around 4 P.M.

60. The PPD segregated those gathering in downtown into two groups: those who were there to support Trump and anti-Trump protesters. PPD ordered anti-Trump protesters to limit their activities to the assigned "free speech zone."

61. Near the only area PPD made available for the anti-Trump protesters to assemble, the so-called "free-speech zone," PPD set up fence barricades lining the north and south sides of Monroe Street between 2nd and 3rd Streets for the purpose of keeping Trump supporters and anti-Trump protesters separated. The street between the two groups created a "safe zone" for PPD in between the two factions. There was no barricade, however, on the south side of Monroe Street, crossing 2nd Street. PPD's leaving this gap in the barricades left the Trump supporters who were exiting the Trump rally around 8:30 P.M. free to harass anti-Trump protesters.

62. Trump supporters attending Trump's rally entered the Convention Center through the south entrance. About 15,000 Trump supporters ended up inside the Convention Center for the Trump rally, while another 4,000 to 5,000 gathered at the south end of the Convention Center.

63. Over 6,000 peaceful anti-Trump protesters assembled in the designated area north of the Convention Center, along the northern sidewalks of Monroe Street, and along Second and Third Streets.

64. Given Trump's policies and his anticipated pardon of Arpaio, anti-Trump protesters had a strong First Amendment interest in having their messages heard by Trump supporters. Protestors included young children, students, elderly people, people with disabilities, and people of various races, ethnicities, and socio-economic backgrounds. Spurred by a desire for civic engagement after Trump's election, many anti-Trump protesters were exercising their First Amendment speech and assembly rights for the first time. These protestors marched, calmly gathered, displayed signs, set up water stations, and peacefully chanted as early as 1:00 P.M. Throughout the day anti-Trump protesters chanted the following messages: "Don't Pardon!"; "No Trump no KKK, no fascist USA!"; and "This is what democracy looks like!" Trump Protestors also held posters with similar political messages (See attached Exhibit 5).

65. As a result of PPD's unjustified and violent termination of the Trump Protest, PPD silenced anti-Trump protesters at the precise moment that they sought to have their opinions heard by the intended audience—President Trump and his supporters as they left the Convention Center.

***Defendants' Violence Was Directed at Anti-Trump Protestors; the Trump Supporters Were Spared***

66. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

67. Despite the overwhelmingly "peaceful, prepared, and civil" nature of the group assembled and the discussions before with organizers, the police came dressed in full riot gear and armed with weaponry to confront anti-Trump protesters. Before the Trump Protest, PPD officials had "coordinated multiple group meetings" with Secret Service staff. Indeed, the PPD's "Dignitary Protection Branch of Operations" orchestrated the movements of all of the high-level officials participating in the rally inside the Convention Center: the President, Vice President, President's Chief of Staff, and the Secretary of Housing and Urban Development. PPD managed their movements "in partnership with federal . . . law enforcement agencies."

68. PPD limited the area where anti-Trump protesters could assemble to engage in their First Amendment activities to a small area north of the Convention Center. 80. Throughout the day, PPD showed clear antagonism to the First Amendment rights of the anti-Trump protesters in this area, and preference for Trump supporters. For instance, one PPD officer advised other officers to "stay on this side. They're more pro-police on this side than that side," encouraging police to stay away from anti-Trump protesters and near Trump supporters. Later, another PPD officer describing Trump supporters said, "There's just a different look about [the Trump supporters]. They're so calm on this side," and said without basis that the anti-Trump protesters who oppose Trump's politics were paid to be there.

69. PPD's violent dispersal of anti-Trump protesters was at the exact time that Trump and his supporters would be exiting the Trump rally inside of the Convention Center. PPD command staff told its officers that it would end the Trump Protest by 9:00 P.M. One PPD officer told another, "Boss said we'll be out of here by nine." To ensure officers were "out of [t]here by nine," without justification, PPD violently dispersed anti-Trump protesters around 8:30 P.M.

70. Prior to the launch of the first pepper bullet and tear gas canisters by PPD, the Trump Protest was carried out by the thousands assembled in a lawful manner. Assuming some isolated incidents of throwing plastic water bottles by a few, these did not justify firing and harming the many. No Trump protester threw any dangerous objects, nor initiated use of the weapons used by the PPD; they did kick the gas canisters thrown by police away from anti-Trump protesters, or were near the shaking fence. Rather than isolating and dealing with the small number of people whose conduct it viewed as improper, PPD resorted to violence against all. There was no lawful justification for this police action as the few persons who had been near the shaking the fence and threw plastic water bottles and kicked gas away from the protestors at around 8:32 P.M. had immediately dispersed (See attached Exhibits 3-6). There was no need for the PPD to continue to escalate their demonstration of force by moving the Police Line through downtown, assaulting everyone in their path.

71. As they swept through downtown, removing everyone in sight, PPD officers deliberately targeted anti-Trump protesters and persons who were chanting and holding anti-Trump posters expressing their views critical of Trump.

72. The conduct complained of herein was undertaken pursuant to policies, practices, and customs of the PPD, an agency of the City of Phoenix, and the City of Phoenix. At all relevant times, Defendants City of Phoenix and Chief Jeri L. Williams ratified the unlawful conduct of PPD officers and command staff.

## MUNICIPAL LIABILITY

### *Defendant City of Phoenix Is Responsible for the Illegal Policies, Procedures, and Practices Utilized by by the PPD at the Trump Protest.*

73. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

74. The City of Phoenix has vested final decision making authority in its police chief, Defendant Williams, in the area of law enforcement and setting and implementing the policies and practices of the PPD including but not limited to the development, implementation and/or ratification of the PPD's procedures, policies, regulations, practices, and/or customs related to its use of force in response to

22

political protests, the proper handling of large political protests, demonstrations, and marches, and the use of weapons against civilians including gas and projectiles.

75. On August 22, 2017, PPD officers engaged in an inordinate use of force, unnecessarily injuring thousands of people at the precise moment they intended to express their views critical of Trump, without warnings. Immediately following this violent display of force, and despite acknowledging that anti-Trump protesters were "peaceful, prepared, and civil," the procedures and violence used by PPD were ratified and found well within accepted City practices by the key policy makers for the City of Phoenix in these areas—Chief Williams and City Manager Zuercher.

76. In a press conference the same night (following the PPD assault of hundreds and possibly thousands of anti-Trump protesters without legal justification, with officers shouting obscenities at the protesters and indiscriminately using dangerous weapons to disperse without warning, in violation of the constitutional protections of speech and to be free from excessive force and PPD policy), Defendant Williams stated that she was "just so proud to be the police chief of men and women who literally showed that professionalism—under contentious scenarios and situations—they demonstrated it flawlessly." Chief Williams also repeatedly stated that on August 22, 2017, the night of Trump's rally, she "believe[s] the actions of our officers reflected the direction I gave them," and that "our community members went home safely."

77. Then-Mayor Stanton stood by Chief Williams in this press conference as she praised the PPD officers for displaying "professionalism" as they violently silenced the views of anti-Trump protesters viewed as "radical" and harmful to law enforcement by PPD officers. 91. City Manager Ed Zuercher issued a memorandum on August 28, 2017, to Chief Williams stating, What all members of the Phoenix Police Department accomplished on August 22 was notable. In an emotional atmosphere, our police officers showed professionalism in ensuring the safety and First Amendment rights of the community. There were no serious injuries or property damage and only four related arrests. . . .

78. The City of Phoenix has a "strong" City Manager form of government, with a "weak" Mayoral role; Zuercher has the authority to hire and fire the Chief of Police. Zuercher's praise of Chief Williams, and the PPD's assaults on anti-Trump protesters under her leadership as "notable and "professional"

23

further demonstrate after-the-fact ratification by the relevant Phoenix officials of the above-described

PPD unconstitutional violent and indiscriminate acts on August 22, 2017.

***As a Matter of Policy and Practice Defendant Williams Allowed Defendant City of Phoenix to Maintain Inadequate Equipment to Peacefully and Lawfully Control Protests and Demonstrations.***

79.   Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

80.   Defendant Williams and her delegated command staff were aware prior to August 22, 2017, that the City did not possess the proper equipment, and in sufficient amount, to adequately deliver warnings and dispersal messages to protestors prior to and after commencing of the use of force.

81.   The only verbal dispersal order that was given on August 22, 2017, was made about 9:00 P.M. in English only, despite PPD's knowledge that a significant number of the protestors were Spanish speakers. In a report after the protest, City Manager Ed Zuercher, and Defendant Williams admitted that in the future the City needed to "increase the number and use" of bullhorns and megaphones, and other means for crowd communication and direction.

82.   It was not until June 13, 2018, that Defendant Williams submitted a procurement request to the Phoenix City Council for a new long range acoustic device "specifically designed to address large crowds."

83.   Given the demonstrated lawless actions by the PPD under the direction of Defendant Williams, use of the particular LRAD device Williams has requested must be subjected to great scrutiny. It has been found in other jurisdictions that, when used at the volume levels intended by PPD, the LRAD itself becomes a weapon of excessive force and great harms, including irreversible damage to the hearing of protesters.

***As a Matter of Policy, Practice, and Custom, Defendant City Through Defendant Williams Failed to Adequately Train PPD Officers in Lawful Crowd Control Techniques.***

84.   Plaintiff realleges and incorporate by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

85. Defendant Williams and her delegated command staff were aware that the unlawful use of dangerous weapons in violent and unlawful ways to break up peaceful associations and speech is a regular practice of PPD personnel, and a custom ingrained in the marrow of the PPD. It was therefore critical to take all steps necessary to ensure that official policy was changed, and officers were trained in a manner sufficient to address the practice and custom to violate First and Fourth Amendment rights.

86. PPD policy directs that bean bags should not be fired at closer than five feet and that the lower torso, legs, and buttocks should be the primary targets. The PPD policy on bean bags prohibits hitting the head, neck, and spine and warns that "shots to non-target areas" (head, neck, spine, thorax, and spine) "can result in fatal or serious injury."

87. As for the use of pepper spray, PPD policy specifically orders, "Do not use within three (3) feet of a subject as soft tissue damage could occur." (Emphasis in policy).

88. PPD policy is silent on what officers and command staff must do to ensure that police warnings prior to dispersal are given and heard. Despite the legal necessity of prior warnings, the policy provides no guidance on what warnings or dispersal instructions must be given to protestors exercising their First Amendment rights.

89. Additionally, PPD policy does not restrict the use of less-lethal munitions on already dispersing crowds or individuals, and crowds that are retreating, nor on persons who are using recording devices to lawfully document public police actions.

90. The failure to maintain adequate policies, and to regularly train PPD personnel on these and proper crowd control, led to the injuries suffered by Plaintiff. The need for training in this instance was obvious.

91. Defendant Williams and Defendant City have known of the deficiencies in PPD policies and training since at least 2010 when its officers violently shot pepper spray at protesters marching for immigration reform from Falcon Park to Tent City.

92. In October 2014, at demonstration in downtown Phoenix to protest police brutality, PPD officers indiscriminately and without warning fired pepper bullets at protestors.

93. Similarly, at a rally at Phoenix City Hall in response to the fatal shooting of Alton Sterling in July 2016, PPD repeatedly pepper sprayed protestors without warning as a "crowd-control measure."

94. In all of the above actions, the City has acted with deliberate indifference to the rights of the public to engage in lawful expressive activity in traditional public fora within the City, and to be free from excessive force.

95. Despite the long history of unlawful PPD conduct at demonstrations, and the longstanding deficiencies in the training of PPD line and command staff on proper law enforcement conduct at demonstrations and regarding the use of force at peaceful demonstrations, the City failed to adequately train its officers and command staff prior to August 22, 2017, in the rights of demonstrators, lawful crowd control, dispersal orders, separating those engaged in unlawful conduct from those engaged in lawful conduct, the permissible use of "less-than-lethal" weapons in crowd control/demonstration situations, and the permissible use of force and circumstances justifying it in such situations. This failure amounted to deliberate indifference to the rights of persons with whom the police come into contact.

96. Defendant Williams had and delegated final responsibility and authority to persons within her command staff to act as the final policy maker at the Trump Protest to decide whether to declare the assembly unlawful, whether to give warnings or instructions to disperse, and whether to use force. Defendant Williams has stated that at all times during this protest the PPD officers and command staff on the scene were acting at her direction. The persons who made these decisions acted as the delegated policy maker for the City of Phoenix on these issues. There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## ALLEGATIONS

97. As a result of the conduct of Defendants described above, Plaintiff has been denied their constitutional rights. Defendants' policies, practices, conduct, and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiff, including but not limited to further violations of their constitutional rights. Plaintiff has no plain, adequate, or complete remedy at law to address the wrongs described herein. Plaintiff therefore seeks injunctive relief restraining Defendants from continuing to

engage in and enforce the unconstitutional and unlawful policies, practices, conduct, and acts described herein.

**FIRST CLAIM FOR RELIEF**
**EXCESSIVE FORCE**
**(Fourth and Fourteenth Amendments, 42 U.S.C. § 1983)**

98. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

99. The conduct of each Defendant violated the rights of Plaintiff to not be subjected to the use of excessive force, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and entitles Plaintiff to bring suit and recover damages pursuant to 42 U.S.C. § 1983.

100. As a proximate result of the wrongful, malicious, and violent acts of Defendants, they caused Plaintiff to suffer physical injuries including being shoved by riot shields, getting shot in a sensitive area by a high-powered projectile and being covered in chemical residue from the tear gas and pepper spray deployed by PPD. Plaintiff experienced shock and injury to the nervous system, and was injured in their health, strength and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and emotional distress.

101. By reason of the aforementioned acts and omissions of Defendants, Plaintiff has incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and/or other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

102. In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiff. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious.

**SECOND CLAIM FOR RELIEF**
**FREEDOM OF SPEECH AND ASSOCIATION**
**(First and Fourteenth Amendments, 42 U.S.C. § 1983)**

103. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

27

104. The actions of the Defendants, as set forth above, violated Plaintiff's rights to freedom of speech and association guaranteed by the First Amendment to the Constitution of the United States. Defendants acted to eliminate any possibility of Plaintiff's exercise of their rights to speech and association by the unnecessary and violent acts described above. Further, Defendants discriminated against protestors based on their viewpoint only ending the ability of those who had an anti-Trump message to speak, and provided no alternative means for continuing speech and assembly.

105. As a proximate result of the wrongful, malicious, and violent acts of Defendants, Plaintiff suffered compensable and irreparable injuries including having their rights to engage in the constitutionally protected activities of political speech and assembly truncated, extinguished and/or deprived them.

106. In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiff. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

## THIRD CLAIM FOR RELIEF
### DUE PROCESS
#### (Fourteenth Amendment, 42 U.S.C. § 1983)

107. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

108. The actions of the Defendants including but not limited to targeting anti-Trump protesters and using excessive force without warning or declaring an unlawful assembly without regard to legitimate law enforcement objectives, were deliberately indifferent to the rights and wellbeing of anti-Trump protesters as set forth above. The level of force and violence employed by Defendants shocks the conscience and violates Plaintiff's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution.

109. As a proximate result of the wrongful, malicious, and violent acts of Defendants, they caused Plaintiff to suffer physical injuries including being shoved by riot shields, getting shot in a sensitive area by a high-powered projectile and being covered in chemical residue from the tear gas and pepper spray deployed by PPD. Plaintiff experienced shock and injury to the nervous system, and was injured in

28

their health, strength and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and emotional distress.

110. By reason of the aforementioned acts and omissions of Defendants, Plaintiff has incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and/or other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

111. In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiff. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

**FOURTH CLAIM FOR RELIEF**
**EQUAL PROTECTION**
**(First and Fourteenth Amendments, 42 U.S.C. § 1983)**

112. Plaintiff realleges and incorporates by reference as if fully set forth herein the allegations set forth previously and subsequently in this complaint.

113. The actions of the Defendants, as set forth above, violated Plaintiff's Fourteenth Amendment rights to equal protection of the laws of the United States. The PPD discriminated against protestors based on their viewpoint, made no lawful declaration of unlawful assembly, dispersed protestors without warning or justification, and provided no alternative means for continuing speech and assembly.

114. The actions of Defendants impermissibly treated the Trump supporters better than other persons assembled for the Trump Protest (including Plaintiff). This was done in violation of both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by granting the Trump supporters, whose views it found acceptable, the use of a public forum, while denying the same public forum to those wishing to express views less favored by Defendants.

115. As a proximate result of the wrongful, malicious, and violent acts of Defendants, they caused Plaintiff to suffer physical injuries including being shoved by riot shields, getting shot in a sensitive area by a high-powered projectile and being covered in chemical residue from the tear gas and pepper spray deployed by PPD. Plaintiff experienced shock and injury to the nervous system, and was injured in

their health, strength and activity, suffering extreme and severe mental anguish and physical pain, anxiety, humiliation, and emotional distress.

116. By reason of the aforementioned acts and omissions of Defendants, Plaintiff has incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and other special and general damages, in an amount according to proof, but in excess of the jurisdictional limits of this Court.

117. In doing the foregoing wrongful acts, the individual Defendants, and each of them, acted in intentional, reckless, and/or callous disregard for the constitutional rights of Plaintiff. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

A. Declaratory relief concerning the unconstitutionality of Defendants' actions as described herein;

B. A preliminary and permanent injunction prohibiting Defendants from engaging in any of the unconstitutional behaviors as described herein and to put into place safeguards sufficient to ensure that they do not continue in the future;

C. Compensatory, general, statutory, and special damages for themselves in an amount according to proof;

E. Exemplary damages against each of the individual Defendants in an amount sufficient to deter and make an example of those Defendants;

E. Attorneys' fees and costs, and costs of suit, as provided by 42 U.S.C. 1988 and any other applicable authority; and

F. Such other and further relief as this Court deems just and proper.

Dated this day of Month, year.

Joshua Cobin
1892 N Hamilton Pl.
Chandler, AZ 85225
Telephone: (602) 390-9130
joshua@cobin.me
Plaintiff, in Proper Person